JAP:VR
F.#2009R01575

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**M-09-1147**

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

TAMBA KABA,

    Defendant.

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
<u>FOR ARREST WARRANT</u>
18 U.S.C. § 545

- - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

    William Shaw, being duly sworn, deposes and says that he is a Special Agent with United States Immigration and Customs Enforcement ("ICE"), duly appointed according to law and acting as such.

    Upon information and belief, on or about and between November 2007 and September 2008, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant TAMBA KABA ("KABA"), together with others, did knowingly and intentionally import and bring into the United States merchandise contrary to law, that is, elephant ivory, contrary to Title 16, United States Code, Sections 1531 and 1538(c) and Title 50, Code of Federal Regulations, Section 23.13, all in violation of Title 18, United States Code, Section 545.

    (Title 18, United States Code, Section 545)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I, William Shaw, being first duly sworn upon my oath, depose and state, that I am a Special Agent with ICE, and have been employed as such since November 2007. I am a graduate of the Federal Law Enforcement Training Center Criminal Investigator's School, at Glynco, Georgia and a graduate of ICE's Special Agent Basic Training Program. I received a Bachelor's Degree in Physics, and I was previously employed as a Reactor Systems Analyst with the United States Nuclear Regulatory Commission.

2. I am currently a Special Agent in the General Smuggling and Trade Enforcement Group within ICE's Office of Investigations at John F. Kennedy International Airport in Queens, New York ("JFK"). My current duties include investigating commercial fraud and theft, the enforcement of intellectual property rights, the recovery of cultural property and general smuggling investigations, including the smuggling and unlawful importation of endangered species into the United States.

3. The information contained in this Affidavit is based upon my knowledge, experience, and training, upon my investigation of the facts of this case and my communications

---

[1] Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause, I have not set forth all of the facts and circumstances of which I am aware.

with other law enforcement officers within ICE, the United States Fish and Wildlife Service ("FWS"), and Customs and Border Protection ("CBP" or "Customs").

I. THE ENDANGERED SPECIES ACT

4. The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq., provides that it is unlawful to engage in trade or to possess any specimens traded contrary to the provisions of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), 16 U.S.C. § 1538(c). CITES classifies wildlife into three categories (Appendix I, II and III) and accords specific trade protection to fauna and flora that are listed in these categories. In order to trade such wildlife from one foreign country to another, special international permits are required, known as CITES permits. Elephants, members of the family *Elephantidae*,[2] are afforded the protection defined in the Endangered Species Act for CITES Appendix I wildlife.

5. The United States implements its obligations under the CITES treaty through regulations promulgated at Title 50, Code of Federal Regulations ("CFR"), Part 23. Section 23.4(a) specifies that Appendix I includes "species threatened with extinction that are or may be affected by trade." 50 C.F.R. § 23.4(a). Trade in Appendix I specimens may take place only in exceptional circumstances. Id. Section 23.13(a) provides, in

---

[2] The family *Elephantidae* includes two species, the African elephant, *Loxodonta africana*, and the Asian elephant, *Elephas maximus*.

pertinent part, that it is unlawful to import or engage in international trade with any specimen of a species listed in Appendix I, II or III, except as provided for in the regulation. See 50 C.F.R. § 23.13(a). Section 23.20(e) provides that in order to import into the United States any wildlife or plant listed in Appendix I of CITES from any foreign country, a United States import permit issued pursuant to 50 C.F.R. § 23.35, and a valid foreign export permit issued by the country of origin or a valid foreign re-export certificate issued by the country of re-export, must be obtained prior to such importation. See 50 C.F.R. § 23.20(e). The criteria for an import permit issued pursuant to Section 23.35 include the following: (1) the proposed import would be for purposes that are not detrimental to the survival of the species, and (2) the specimen will not be used for primarily commercial purposes. See 50 C.F.R. § 23.35(c).

II. THE INVESTIGATION

 A. March 21, 2008 Shipment from Nigeria

  6. On or about March 21, 2008, an air cargo shipment consisting of fourteen (14) boxes weighing approximately 1,146 kilograms arrived at JFK Airport from Lagos, Nigeria aboard Lufthansa Airlines Flight No. 8160 (hereinafter the "Nigeria Shipment"). The Nigeria Shipment was declared to Customs to contain metal handicrafts and specified the tariff codes for copper, ceramic and wood articles.[3]

---

[3] This information is provided on CBP Form 3461, the Customs Entry Form, which generally accompanies an air cargo shipment

7. Documents associated with the Nigeria Shipment, including Air Waybill[4] Number 020-8196-5111 and the Customs Entry Form, indicated the following: (1) the shipment originated in Lagos, Nigeria; (2) the shipment was addressed to the defendant, TAMBA KABA at 1833 Longview Court, Teaneck, New Jersey 07666; (3) the exporter was Lamine Biakipe, c/o Dhanco NIG Ltd., MM1 Airport IKE, Room 401, Nigeria; and (4) a Customs broker operating in Queens, New York (hereinafter "CUSTOMS BROKER") was to handle the shipment.[5]

8. Law enforcement agents inspected the Nigeria Shipment and found twenty-three (23) elephant ivory pieces contained in fifteen (15) packages.[6] The packages, wrapped in paper and other packing material, were concealed within the bases

---

into the United States and sets forth information about a shipment's arrival date, ultimate consignee's name and address, description of merchandise and a certification of the accuracy of the information contained in the form.

[4] The Air Waybill also accompanies the air cargo shipment into the United States and sets forth information about the shipment, including the shipper's name and address, consignee's name and address, airports of departure, transit and destination, and the nature and quantity of the goods being shipped.

[5] Customs brokers generally provide services to importers relating to the filing of Customs documentation for shipments into the United States.

[6] The law enforcement agents inspecting this shipment included agents with the United States Fish and Wildlife Service, who were able to determine, based on their training and experience and the unique characteristics of these pieces, that the pieces were elephant ivory.

and cavities of metal statues. The ivory contained within these packages included statues, masks, and two large, carved whole elephant tusks. Samples of the ivory were collected, and the ivory pieces marked for future identification. The ivory was then repackaged and eventually released from Customs control.

9. A preliminary search of United States Department of the Interior databases revealed that neither the defendant nor the exporter of record for the Nigeria Shipment applied for or received CITES Appendix I permits authorizing the importation of elephant ivory into the United States.

10. On or about March 28, 2008, the Nigeria Shipment was picked up from the Lufthansa Airlines Cargo Warehouse by a freight forwarding company operating in Queens, New York (hereinafter "FREIGHT FORWARDER"). Under law enforcement surveillance, the Nigeria Shipment was taken to FREIGHT FORWARDER's warehouse in Queens, New York for temporary storage.

11. Law enforcement agents interviewed employees from FREIGHT FORWARDER and learned that the defendant TAMBA KABA was scheduled to pick up the Nigeria Shipment from FREIGHT FORWARDER's warehouse on March 31, 2008. Agents also learned that KABA owed CUSTOMS BROKER approximately $6,000.00 in shipping and broker fees for the Nigeria Shipment. Agents subsequently interviewed CUSTOMS BROKER, who stated that the defendant TAMBA KABA had paid him in cash on or about March 31, 2008 for the fees associated with the Nigeria Shipment. CUSTOMS BROKER also

reviewed TAMBA KABA's file and provided a photocopy of TAMBA KABA's New Jersey State identification card to agents.

12.  On or about March 31, 2008, law enforcement agents conducting surveillance of FREIGHT FORWARDER's warehouse observed two black males driving a yellow Penske box truck take delivery of the Nigeria Shipment from FREIGHT FORWARDER.  The agents later returned to FREIGHT FORWARDER's warehouse and spoke to FREIGHT FORWARDER's employees who had processed the delivery of the Nigeria Shipment.  Agents obtained a photocopy of the defendant TAMBA KABA's Georgia drivers license from one of these employees.  According to the employee, the photo identification was provided to him by the man taking delivery of the Nigeria Shipment.

13.  According to records subsequently obtained from Penske Truck Rental, the aforementioned yellow Penske box truck was rented to the defendant TAMBA KABA on March 31, 2008.

14.  Law enforcement agents followed the aforementioned yellow Penske box truck from FREIGHT FORWARDER's warehouse after the two men in the truck took delivery of the Nigeria Shipment on March 31, 2008.  The truck made one stop in Queens, New York where the passenger exited the vehicle, before proceeding to New Jersey.  At approximately 5:16 p.m., the truck parked in front of a residence located in Teaneck, New Jersey.

15.  On April 1, 2008, further investigation led to the recovery of empty boxes and packing materials from a dumpster located at Extra Space Storage, 140 Route 17 South, Lodi, New

Jersey. The empty boxes and packing materials were identified as those used to import the Nigeria Shipment based, among other things, on the corresponding Airway Bill Number on the boxes and packing materials found in the dumpster.

B. <u>March 25, 2008 Shipment from Uganda</u>

16. On or about March 25, 2008, an air cargo shipment consisting of eighteen (18) boxes weighing approximately 1,428 kilograms arrived at JFK Airport in Queens, New York from Kampala, Uganda aboard British Airways Flight No. 183 (hereinafter the "Uganda Shipment"). The Uganda Shipment was declared to Customs to contain wood statues, wooden furniture, and ceramic handicrafts.

17. Documents associated with the Uganda Shipment, including Air Waybill Number 125-3571-5584 and the Customs Entry Form, indicated the following: (1) the shipment originated in Kampala, Uganda; (2) the shipment was addressed to the defendant, TAMBA KABA at 1833 Longview Court, Teaneck, New Jersey 07666; (3) the exporter was Ali Sarkor, P.O. Box 33593, Mengo Plot 201, Kampala, Uganda; and (4) CUSTOMS BROKER was to handle the shipment.

18. Law enforcement agents inspected the Uganda Shipment and found forty-eight (48) elephant ivory pieces, with a combined weight of 54.2 pounds.[7] The ivory pieces were concealed

---

[7] The law enforcement agents inspecting this shipment included agents with the United States Fish and Wildlife Service, who were able to determine, based on their training and experience and the unique characteristics of these pieces, that the pieces were

inside two large hollowed-out wooden statues. Samples of the ivory were collected, and the ivory pieces marked for future identification. The ivory was then repackaged and eventually released from Customs control.

19. A preliminary search of United States Department of the Interior databases revealed that neither the defendant nor the exporter of record for the Uganda Shipment applied for or received CITES Appendix I permits authorizing the importation of elephant ivory into the United States.

20. The Uganda Shipment was picked up from the British Airways Cargo Warehouse by FREIGHT FORWARDER and taken to FREIGHT FORWARDER's warehouse in Queens, New York for temporary storage.

21. Law enforcement agents interviewed employees from FREIGHT FORWARDER and learned that the defendant TAMBA KABA had asked that the Uganda Shipment be delivered to Extra Space Storage, 140 Route 17 South, Lodi, New Jersey. See supra ¶ 15. Agents were subsequently informed by employees of FREIGHT FORWARDER that the defendant had decided to pick up the shipment himself from FREIGHT FORWARDER's warehouse.

22. On or about April 4, 2008, at approximately 11:15 a.m., the defendant TAMBA KABA arrived at FREIGHT FORWARDER's warehouse to take delivery of the Uganda Shipment. Law enforcement agents conducting surveillance observed the defendant TAMBA KABA at the warehouse's loading bay, operating a white

---

elephant ivory.

Penske box truck with Indiana license plate number 1098953. Agents followed the truck from Queens to New Jersey, where the truck was parked in the driveway of the aforementioned residence located in Teaneck, New Jersey. See supra ¶ 14.

23. On or about April 5, 2008, at approximately 8:45 a.m., in the vicinity of the aforementioned Teaneck, New Jersey residence, agents observed TAMBA KABA exit the residence, enter the driver's side of the Penske truck and depart.

24. On or about April 5, 2008, at approximately 9:24 a.m., a law enforcement surveillance team observed, and documented on video, the defendant TAMBA KABA arriving at Extra Space Storage, 140 Route 17 South, Lodi, New Jersey. Soon thereafter, at approximately 9:42 a.m., KABA was joined by two young black males who helped him unload the truck and then departed at approximately 10:08 a.m.

25. According to records obtained from Penske Truck Rental, the aforementioned truck was rented to the defendant TAMBA KABA on April 4, 2008.

C. The Defendant's Unlawful Selling of Ivory

26. According to a review of TD Bank account records for TAMBA KABA, d/b/a TAMBA IMPORTS, Teaneck, New Jersey ("TD Bank Account"), on or about October 9, 2008, there was an outgoing wire transfer in the amount of $3,000.00 to "Ali Sarkor," the exporter listed on the documents associated with the Uganda Shipment. See supra ¶ 17.

27. A further review of these TD Bank Account records shows that, between November 1, 2007 and October 30, 2008, checks totaling $71,325 were deposited into KABA's TD Bank Account. The majority of these checks were from art galleries and art dealers.

28. On or about January 7, 2009, agents interviewed an art dealer operating a retail African art business in Houston, Texas (hereinafter "ART DEALER").[8] ART DEALER stated that he had met with the defendant TAMBA KABA in or about 2008 and purchased ivory valued at approximately $10,000 from the defendant.

29. On or about October 29, 2009, agents showed ART DEALER a photo array, which included a photo of the defendant TAMBA KABA and five other individuals.[9] After viewing the photo array, ART DEALER pointed to the photograph of the defendant TAMBA KABA and identified him as the man from whom he had purchased ivory in or about 2008.

30. According to a review of KABA's TD Bank Account records, at least four checks from ART DEALER, totaling approximately $12,000, were deposited into this account between September 2007 and September 2008.

31. On or about January 14, 2009, ART DEALER met with law enforcement agents and turned over to agents eleven (11)

---

[8] The identity of ART DEALER is known to ICE and FWS agents.

[9] The photograph of the defendant TAMBA KABA contained in the photo array was from the defendant's Georgia drivers license issued by the Georgia Department of Driver Services on March 17, 2006.

pieces of ivory he stated he purchased from the defendant TAMBA KABA. Agents inspected this ivory and determined that one of the ivory carvings was a match to a carving documented from the March 25, 2008 Uganda Shipment discussed above.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued so that the defendant TAMBA KABA may be dealt with according to law.

WILLIAM SHAW
Special Agent
Immigration and Customs Enforcement

Sworn to before me this
19th day of November, 2009

THE HON         s/ Azrack          'K
UNITED                             JDGE
EASTERN                            'K

12